Filed 3/20/24  E.A. v. Superior Court CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| E.A. et al.,<br><br>  Petitioners,<br><br>  v.<br><br>THE SUPERIOR COURT OF KERN COUNTY,<br><br>  Respondent.<br><br>KERN COUNTY DEPARTMENT OF HUMAN SERVICES,<br><br>  Real Party in Interest. | F087285, F087286<br><br>(Super. Ct. Nos. JD144133-00, JD144135-00) |

## THE COURT[*]

ORIGINAL PROCEEDINGS; petitions for extraordinary writ.  Christie Canales Norris, Judge.

E.A., in propria persona.

R.F., in propria persona.

No appearance for Respondent.

Margo A. Raison, County Counsel, and Alexandria Ottoman, Deputy County Counsel, for Real Party in Interest.

-ooOoo-

---

[*]  Before Franson, Acting P. J., Meehan, J. and DeSantos, J.

Petitioners Erin A. (case No. F087285) (mother) and Ryan F. (case No. F087286)[1] (father) (collectively, the parents) are the parents of G.F. (born 2017), and R.F. (born 2022) (collectively, the children). The parents have filed petitions for extraordinary writ pursuant to California Rules of Court, rule 8.452, contesting the denial of reunification services and the setting of a Welfare and Institutions Code section 366.26 hearing.[2] For the reasons set forth *post*, we deny both writ petitions.

**FACTUAL AND PROCEDURAL HISTORY**

*Referral and Petition*

On December 17, 2022, the Kern County Department of Human Services (department) received a referral that R.F., then 3 months old, was taken to the emergency room by mother when mother noticed one of R.F.'s legs was swollen. R.F. was found to have a fractured left femur and was being transferred to Madera Children's Hospital. Law enforcement was investigating the situation, as there was concern that mother and father had no explanation for how the injury occurred. Mother also lied to law enforcement about not having a telephone; she was seen talking on the telephone, which she hid when an officer entered the room.

Mother stated she was a stay-at-home mom and R.F.'s primary caregiver, and that father worked full time and had not been around R.F. While mother admitted to arguing and slight pushing with father, she denied any domestic violence. According to mother, her older child, G.F., then five years old, may have injured R.F., as she plays "rough" with her. Mother initially denied being in touch with father since arriving at the hospital, but later admitted she had been in contact with him and had deleted all of their text messages. Mother then stated that father told her he may have injured R.F. by pulling her leg up when he was changing her diaper. Mother said she did not want to say anything or

---

[1]    On this court's own motion, case Nos. F087285 and F087286 are hereby ordered consolidated under case No. F087285 and all documents shall be filed in that case.

[2]    All further statutory references are to the Welfare and Institutions Code.

get father into trouble, as he was the sole financial provider for the family. At the time, G.F. was said to be in Pasadena with paternal grandmother.

At the home, father told detectives that when he changed R.F.'s diaper a few days earlier, he pulled her leg and may have injured her, but he did not think he hurt her because she did not cry. Father demonstrated on a doll what he had done, which did not display any unusual force likely to cause an injury. Father first denied having heard any noise during the diaper change, then said he may have heard a "pop," then said he did hear a "pop." A message on father's phone to mother stated that he felt bad about injuring R.F. Father claimed he deleted the text messages on advice from paternal grandmother, who did not want him to get into trouble.

A social worker at the hospital was informed that R.F. had numerous fractures on both of her femurs, as well a skull fracture in various stages of healing. Dr. Chen, the hospital's "Medical Director of Child Advocacy," told the social worker that R.F. had a bilateral skull fracture and soft tissue swelling. The skull fracture appeared to be about two weeks old. The left femur had a fracture and the right femur had healing fractures. Dr. Chen noted "chip or buckle fractures," which could be caused by "twisting or pulling scenarios" and highly suspicious of child abuse. Dr. Chen opined these injuries were inflicted and that no prudent parent would use such force as to cause such injury. Dr. Chen noted a yellow bruise on R.F.'s cheek, which mother attributed to R.F. sleeping on her cheek. However, according to Dr. Chen, children at this age do not bruise simply by not being mobile. The department placed a hold on R.F. once she was ready for discharge and, on December 20, 2022, G.F. was placed into protective custody.

On December 20, 2022, a section 300 petition was filed alleging, pursuant to subdivision (a), that G.F. was at risk of harm in mother and father's care due to the injuries found on her sister, R.F. The following day, a section 300 petition was filed alleging, pursuant to subdivisions (a) and (e), that R.F. was at risk of harm due to the

3.

injuries she had received and the failure of mother and father to provide a reasonable explanation as to how R.F. sustained the injuries.

On December 21, 2022, a social worker called mother and father. Mother provided the same story she had earlier to explain the leg fractures. Mother denied knowing about the skull fracture, but that two to three weeks earlier, R.F. had hit her head on some metal shelves during an incident with G.F. She stated R.F. cried a bit, but she did not see any bumps or bruises. The social worker then spoke to father, who agreed with mother's version about how the skull fracture occurred. As for the leg fracture, father said he heard a "pop" while changing R.F.'s diaper, but that she did not cry or act abnormally.

*Detention*

At the December 22, 2022 detention hearing, the children were detained and a jurisdiction and disposition hearing set for February 9, 2023.

*Amended Petition*

Following numerous continuances requested both by the department—to await genetic testing, and by mother and father—to have experts review the genetic testing report, the department filed an amended section 300 petition, alleging the same injuries to R.F., but that mother and father knew or reasonably should have known that the other was physically abusing the child. Jurisdiction was continued to September 26, 2023, and eventually set for a contested jurisdiction/disposition hearing on October 17, 2023.

*Jurisdiction*

The department's report prepared for the jurisdiction/disposition hearing included portions of the police report, in which mother stated that father was not present at the time she noticed R.F.'s injury, as he was taking G.F. to a movie. However, when father was asked where G.F. was, he stated that he had left her with his mother the day before to go with her to Pasadena.

Medical records were also included in the department's report and stated mother had had a healthy delivery with R.F.

G.F. was interviewed in January 2023, and asked about her sister's broken leg. G.F. stated that father had told her both of R.F.'s legs were broken but said he was sorry to R.F. When asked why he had said he was sorry, G.F. stated, "[b]ecause they were just wiping her and my dad was being mean but they said 'sorry' together. That's why." G.F. was examined by the child advocacy team at the hospital and no concerns were noted.

Dr. Chen spoke to the social worker and reported R.F. had had an osteogenesis exam on February 7, 2023, which examines genes to see if there are any diseases that could be related to " 'fracture risk.' " The social worker followed up with Dr. Chen on June 9, 2023, who reported that neither a connective tissue disorder nor a medical diagnosis were suspected. Dr. Chen did not see a valid explanation for R.F.'s injuries and that "[a]buse is still in the differential." Dr. Chen stated that mother and father's explanations for how R.F.'s injuries occurred were unlikely.

The social worker again contacted Dr. Chen on June 30, 2023, at which time he reported he had consulted with radiologists Dr. Laningham and Dr. Myracle, who confirmed R.F. had bilateral skull fractures. Dr. Laningham stated that he saw soft tissue swelling and thickening of the membrane next to the skull fractures, which led him to believe the skull fractures were seven to 10 days old. Dr. Laningham did not believe the skull fractures were from the birth process. Dr. Chen reported that the left femur fracture was definite, as Dr. Laningham had found "corner chip fractures." He also explained that spiral fractures occur with a twisting or twerking motion. According to Dr. Chen, genetics was being ruled out as a cause for the injuries and that a " 'reasonably prudent parent would not use sufficient force to cause a fracture' " and that " 'abuse is still in the differential.' "

At the jurisdiction hearing, both mother and father testified. Mother testified that she and father were the exclusive caregivers for both G.F. and R.F., but that maternal and paternal grandparents had also cared for the children. On December 15, 2022, mother dropped R.F. with paternal grandmother. When mother later picked R.F. up, there were people in paternal grandmother's home she had concerns about. She also expressed concerns with maternal grandmother because she did not seem "very motherly." Paternal grandmother had cared for R.F. three to four times previously, but mother denied R.F. had ever had injuries or marks on her when she picked her up after these visits.

Mother testified that it was paternal grandmother who told her not to go to the emergency room with R.F. and to delete her text messages. Maternal grandmother told mother she had been "through this" before and knew "exactly what's going to happen." Mother deleted the text message because she was scared. Mother denied that G.F. ever harmed R.F. She also testified that paternal grandmother had lived with them when G.F. was born until G.F. was about two or three years old and mother had never seen any bruises or scrapes on G.F. when she had been with paternal grandmother. While mother still had no idea how R.F.'s injuries occurred, she now had concerns and doubts about paternal grandmother.

On cross-examination, mother admitted that she lied repeatedly to police. She also admitted that father had never claimed any mistreatment by paternal grandmother, nor had father's brother claimed any mistreatment by paternal grandmother when he was younger. Mother denied ever seeing paternal grandmother doing anything to G.F. or her cousins that caused any concern. She did admit that she never told the department she had any concerns about paternal grandmother.

When mother was asked about the bruise on R.F.'s cheek, mother stated that R.F. fell asleep with a bottle, which applied pressure to her cheek when she was sleeping. When mother was asked whether the story about father changing R.F.'s diaper and hearing a "pop" seemed reasonable, mother admitted that it did not seem reasonable

"now." And when asked about the story involving R.F. hitting her head on a shelf, mother admitted that R.F. had not hit her head so hard that she was concerned enough to take R.F. to be examined by a doctor. Mother admitted that when R.F. hit her head on the shelf, there was no bruising, knot, or bump on her head.

Father testified and admitted to deleting text messages after paternal grandmother told him to do so. Father said that when he heard a "pop" during a diaper change, it sounded like it came from R.F.'s knee. While R.F. had been crying when he changed her diaper, she stopped after he got a clean diaper on her. Other than saying it could have happened in paternal grandmother's care, father had no explanation for how R.F.'s injuries occurred. According to father, when G.F. was six to 12 months old and they were living with paternal grandmother, G.F. had a red mark around her neck and they never left G.F. alone with paternal grandmother after that. Father also claimed that G.F. would come home with bruises on her arm and leg after being with paternal grandmother, but then contradicted himself and said again that G.F. did not go over there alone.

On cross-examination father admitted that other than the one incident while he and mother lived with paternal grandmother, she provided appropriate care for G.F. Father also denied that he was abused by paternal grandmother when he was a child. Father insisted he did not inflict any injuries on R.F. When asked about the skull fracture, father referred to the incident when R.F. hit her head on the shelf. Father did not have any explanation for the older fracture on her left femur. And when asked about the bruise of R.F.'s cheek, he referred to mother's explanation of R.F. sleeping with her face pressed on her bottle.

Father admitted that he had earlier told the social worker that paternal grandmother did not see R.F. on December 15, but he now claimed she did and that he did not remember that at the time he spoke to the social worker. Father also admitted that he never told the social worker that he thought paternal grandmother might have caused the injuries to R.F.

Maternal grandmother testified that she had placement of G.F. and R.F. and that she stopped letting G.F. visit paternal grandmother because they arrived late from a visitation and G.F. was improperly restrained in the front seat of the car. Maternal grandmother also mentioned that G.F. had a bruise on her wrist after a visit with paternal grandmother.

The social worker testified that neither mother nor father had ever expressed any concern about paternal grandmother until October 13, 2023, 10 months after the injury was discovered. Nor had father ever said that R.F. was with paternal grandmother on December 15, 2022.

The juvenile court, in its lengthy ruling, stated that mother and father "have never been honest in this case," citing the inconsistent facts and timelines provided by mother and father to law enforcement when they were interviewed. The court specifically stated that it did not find mother and father's testimony that day to be credible and it did "not find any conversation that they had with any law enforcement officer or with the social worker to ever be credible." The court considered Dr. Chen's explanation of the injuries and found them helpful. The court also found mother and father's blame on paternal grandmother or G.F. or the diaper change explanation not credible and stated, "I think that they are reaching for straws at this point. I do believe they are hiding what truly happened."

The juvenile court found the allegations of the petition true by clear and convincing evidence. Disposition was continued until October 31, 2023, after the department requested a continuance to prepare a report and father asked for a section 360 guardianship assessment.

*Disposition*

Following requests for continuances from father and mother (who had a conflicting criminal court date), the disposition hearing was not heard until December 4, 2023.

In its disposition report, the department recommended that mother and father be denied reunification services pursuant to section 361.5, subdivision (b)(5).[3] The report noted that, while mother and father had completed their recommended case plan classes (physical abuse as perpetrator and parent/child neglect), they had yet to take any responsibility for the abuse of R.F. Maternal grandparents had placement of the children and, since they wished to adopt rather than obtain legal guardianship, a section 360 guardianship assessment was not completed.

Mother and father contested disposition and wished to call family friends as character witnesses. Counsel for the children objected under relevancy and section 352; the department joined in the objection. The juvenile court stated that some of the witnesses could be taken on voir dire but questioned how that would be competent evidence. The court did not think such witnesses would have the expertise to assess whether not offering services would be detrimental to the children. Mother made an offer of proof that these witnesses would be family friends who attended functions with mother and would testify that mother had a positive attachment, mainly to G.F.; that they had not witnessed any negative incidents; that the children had a strong relationship with mother; and that mother parented them effectively. The court found this was not necessarily competent evidence, just "more from the parent standpoint," and did not believe it would be relevant.

Mother then testified about what she had learned in her classes. According to mother, the parenting classes taught her to be "structured as a parent," consistent, and to communicate with father. The abuse class had to do with "domestic violence" and how not to neglect her children. Mother acknowledged that she had had positive tests for cannabis and alcohol. Mother said that G.F. tells her she loves her when she visits and

---

[3] Section 361.5, subdivision (b)(5) provides that reunification services need not be provided to a parent if the child is subject to section 300, subdivision (e) (severe physical abuse of a child under five years of age due to the conduct of a parent or guardian).

that she wants to go home. When asked how she planned to prevent further abuse, mother stated that she would watch the children "24/7" and "like a hawk." Mother still did not have any explanation for what caused R.F.'s injuries and she would not change any of her answers from her previous testimony.

The social worker testified that mother and father had positive visits with the children and the children had a good relationship with them, G.F. having the stronger bond. The social worker testified that the recommendation of the department was that mother and father not be given reunification services because they had not been able to provide an explanation as to how R.F. received her injuries. In making this recommendation, the department took into consideration the bond between G.F. and mother and father, and while there might be some detriment to G.F. if services were not offered, taking into account what happened to R.F., it was more appropriate not to offer services. The department considered R.F. and G.F. together as a sibling bond.

Father testified as to what he had learned in his classes (failure to protect, physical abuse and parenting). He testified he learned about multiple types of abuse, not to say what's on his mind, to take a step back, and how to be a better human being in general. Father stated that the most helpful thing he learned was that other people were going through similar situations and he wished he had been more truthful from the start. Father described G.F. as his "sidekick" and that she wanted to know when she could come home. Father testified that he still did not have any explanation for what happened to R.F.

Mother's counsel argued that mother had learned from her physical abuse course and parenting class that she needed to watch the children closely to avoid further abuse. Counsel also argued that G.F. had a strong bond with mother, and that R.F. did also. Counsel noted that mother had always been cooperative with the department and consistently visited the children. Counsel opined that it would be detrimental not to offer mother reunification services.

Father's counsel agreed with mother's counsel and, since he completed the case plan, would like to have the children back under family maintenance. Father's counsel highlighted the fact that there had been no CPS history as to G.F. and that she was "clearly" bonded to mother and father both, and it would be detrimental to her not to offer reunification services. Counsel also argued that, while R.F. had lived the majority of her life with maternal grandparents, she also had a bond with mother and father.

The children's counsel argued that there was no evidence that services would likely prevent further abuse. Counsel noted that the juvenile court found mother and father's earlier testimony not credible, despite the fact that they had completed components of their case plan at that point already. Counsel stated, "[w]e have nothing new today to suggest that there's any services that could prevent the kind of severe abuse that R[.F.] suffered not simply on one occasion but on … more than one occasion." Counsel argued that, while G.F. had a strong bond with mother and father, she was doing well at maternal grandparent's home and separating well from mother and father at visits, showing that that relationship was not so positive that it would be detrimental not to offer mother and father services, "particularly in light of the fact that … there's [not] any services that could prevent the possibility of this happening again."

Counsel for the department agreed with children's counsel that the "biggest issue" was "how do you provide services that would prevent [further ]abuse when the participants are in denial that they abused the child to begin with." Counsel also noted that G.F. was bonded to her maternal grandparents and that it would be detrimental to G.F. to separate her from her sister.

Following argument, the juvenile court found by clear and convincing evidence that the bypass provision of section 361.5, subdivision (b)(5) did apply. The court agreed that additional services would not prevent further abuse as mother and father "continue to fail to take [accountability] or show any remorse for the injuries to the child." It also reiterated that mother and father lied repeatedly but "really don't take accountability" for

11.

those lies, for instance, blaming paternal grandmother for having them delete their text messages. The court found this to be a "pattern throughout the case of them failing to take accountability for what happened. And they continue to do that." The court emphasized that R.F. was severely injured, which required a lot of force, and that these injuries occurred at various times and were in various stages of healing. While the court acknowledged that mother and father may have been cooperative in that they participated in their case plan, they were not cooperative in the investigation of the injuries, and actively did things to cover it up and hinder the investigation.

The juvenile court found that no additional services were likely to prevent further abuse and there was no competent testimony that R.F. or G.F. were so positively attached to mother and father that failure to try reunification would be detrimental. The court adjudged both G.F. and R.F. minor dependents and removed them from mother and father's physical custody. Reunification services were bypassed and a section 366.26 hearing set for April 2, 2024.

Both mother and father filed petitions for extraordinary writ.

## DISCUSSION

Father and mother's petitions both allege that the juvenile court erred in its rulings, as it was clear from their explanations that they did not perpetrate the abuse on R.F. As such, they contend, there was not enough evidence to sustain the juvenile court's findings of jurisdiction and they further argue that reunification services should have been granted at disposition. We disagree.

" ' "In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. 'In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' [Citation.] 'We

12.

do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.' " ' " (*In re L.O.* (2021) 67 Cal.App.5th 227, 238, quoting *In re I.J.* (2013) 56 Cal.4th 766, 773; accord, *In re R.T.* (2017) 3 Cal.5th 622, 633.)

*Substantial Evidence Supports the Court's Jurisdictional Findings Under Section 300, Subdivision (e)*

Section 300, subdivision (e) provides that a child comes within the jurisdiction of the juvenile court when "[t]he child is under five years of age and has suffered severe physical abuse by a parent, or by any person known by the parent, if the parent knew or reasonably should have known that the person was physically abusing the child."

In essence, mother and father both contend the juvenile court should have believed their insistence that they did not cause R.F.'s injuries nor did they know how the injuries occurred. We conclude the evidence was sufficient to support the juvenile court's jurisdictional findings.

At the outset, we note that section 300, subdivision (e), does not require the court to identify the perpetrator. (*In re E.H.* (2003) 108 Cal.App.4th 659, 670.) "A section 300[, subdivision ](e) abuse finding may be based on circumstantial evidence showing that the parents knew or reasonably should have known about the abuse, even when it cannot be determined which caretaker inflicted the abuse." (*K.F. v. Superior Court* (2014) 224 Cal.App.4th 1369, 1382.) "A finding may be supported by circumstantial evidence … [o]therwise, a family could stonewall the [d]epartment and its social workers concerning the origin of a child's injuries and escape a jurisdictional finding under subdivision (e). (*E.H.*, at p. 670.)

There was sufficient evidence presented that mother and father knew or reasonably should have known that R.F. suffered physical abuse. Mother and father initially stated that they were the only ones caring for the children, but they changed their stories as the case went on. Mother and father only belatedly brought up suspicions about

13.

the paternal grandmother. Mother and father's explanations about how R.F. suffered her injuries were not credible, as Dr. Chen confirmed, and the juvenile court was not required to accept their explanations or believe any of their stories.

The juvenile court, in its ruling, was very aware of how both mother and father had lied repeatedly throughout the case, stating, "[t]here are so many inconsistencies in their stories that they've told that … I don't think they know what the truth is. I think they know what happened and they are not disclosing what happened." Although mother and father contend otherwise, as previously explained, issues of fact and credibility are the province of the lower court, and we do not reweigh the evidence but merely determine if there are sufficient facts to support the findings of the juvenile court. (*In re L.O.*, *supra*, 67 Cal.App.5th at p. 238.)

Substantial evidence supports the jurisdictional findings.

*The Bypass of Reunification Services is Supported by Substantial Evidence*

Mother and father also contend the juvenile court erred in denying them reunification services at disposition. Again, we disagree.

"Reunification services must be provided to the mother and statutorily presumed father of children who have been removed from their parents' custody, unless a statutory exception applies. [Citations.] The statutory exceptions are contained in subdivision (b) of section 361.5, which provides that '[r]eunification services need not be provided' if the court finds 'by clear and convincing evidence' that any of 17 enumerated bypass provisions apply. [Citation.] Subdivision (c) of section 361.5 adds with respect to nearly all of the bypass provisions that, if a bypass provision applies, then the court 'shall not order' reunification services unless the court makes certain countervailing factual findings. [Citations.] In sum, section 361.5, subdivision (a), provides that reunification services are mandatory unless a bypass provision applies; section 361.5, subdivision (b), lists the bypass provisions and provides that reunification services are discretionary if any of them apply; but section 361.5, subdivision (c), provides that *denial* of reunification

14.

services is *mandatory*, not discretionary, with respect to nearly all of the bypass provisions, unless the court makes certain countervailing factual findings." (*In re A.E.* (2019) 38 Cal.App.5th 1124, 1141 (*A.E.*).)

At issue here is bypass provision section 361.5, subdivision (b)(5), which provides: "Reunification services need not be provided to a parent or guardian described in this subdivision when the court finds, by clear and convincing evidence, any of the following: [¶] … [¶] (5) That the child was brought within the jurisdiction of the court under subdivision (e) of [s]ection 300 because of the conduct of that parent or guardian." (§ 361.5, subd. (b)(5).) " ' "[C]onduct" as it is used in section 361.5, subdivision (b)(5) refers to the parent in the household who knew or should have known of the abuse, whether or not that parent was the actual abuser.' " (*L.Z. v. Superior Court* (2010) 188 Cal.App.4th 1285, 1292; *Tyrone W. v. Superior Court* (2007) 151 Cal.App.4th 839, 849.)

Section 361.5, subdivision (c)(3) further provides, in pertinent part: "[T]he court shall not order reunification in any situation described in paragraph (5) of subdivision (b) unless it finds that, based on competent evidence, those services are likely to prevent reabuse or continued neglect of the child or that failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent." " ' "A juvenile court has broad discretion when determining whether … reunification services would be in the best interests of the child under section 361.5, subdivision (c). [Citation.] An appellate court will reverse that determination only if the juvenile court abuses its discretion." ' [Citations.] If the juvenile court's finding that further services would be in the children's best interest is not supported by substantial evidence, then the order for such services constitutes an abuse of discretion." (*A.E.*, *supra*, 38 Cal.App.5th at pp. 1140–1141.)

As discussed above, sufficient evidence supports the juvenile court's determination to bring the children under its jurisdiction as to mother and father under section 300, subdivision (e). Mother and father, however, contend the court erred in not

allowing their character witnesses to testify to a positive attachment between mother and father and the children, in other words, to prove that reunification services would have been in the best interest of the children.

Parents bear "the burden of proving, through competent testimony, the factual predicates to an order for reunification services under section 361.5[, subdivision ](c)(3)." (*A.E.*, *supra*, 38 Cal.App.5th at p. 1148.)  Here, mother and father have failed their burden of proving that not offering reunification services would be detrimental to the children.  Given the offer of proof by mother's counsel, none of the witnesses suggested would be able to address that specific question.  Furthermore, while the juvenile court acknowledged that it heard testimony from mother and father about how closely bonded they are to G.F., it stated it "did not hear any testimony regarding how G[.F.]'s close and positive attachment to her parents would be detrimental if we failed to try reunification services."

In addition, there was sufficient evidence that reunification services would not prevent further abuse.  Mother and father had already participated in parenting classes and abuse prevention classes, but as noted by the juvenile court, ordering services would not prevent further abuse as mother and father "continue to fail to take [accountability] or show any remorse for the injuries to [R.F.]"

Thus, the juvenile court acted within its discretion in finding that reunification services would not prevent further abuse or that termination of reunification services would be detrimental to the children.

## DISPOSITION

The petitions are denied.  The request for a stay of the section 366.26 hearing is also denied.  This court's opinion is final forthwith as to this court.

16.